RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0324p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

           *Plaintiff-Appellee,*

    *v.*

RONDA NIXON,

           *Defendant-Appellant.*

No. 09-5979

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 0:08-cr-11-1—David L. Bunning, District Judge.

Argued: July 25, 2012

Decided and Filed: September 11, 2012

Before: BOGGS, GILMAN, and DONALD, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Annie L. Owens, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellant. Paul McCaffrey, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. **ON BRIEF:** Annie L. Owens, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellant. Paul McCaffrey, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Ronda Nixon worked as a bookkeeper for a small law firm in Kentucky. She used her access to the firm's bank accounts and credit card to pay for personal expenses that were not authorized by the firm's two attorneys. Because of her misuse of the firm's funds, Nixon was charged with eleven counts of wire fraud, two counts of bank fraud, three counts of aggravated identity theft,

and one count of using an unauthorized access device.  Following a jury trial, she was convicted on all 17 counts and sentenced to 54 months in prison.

Nixon now appeals, arguing that (1) the trial was rife with erroneous evidentiary rulings that prevented her from receiving a fair trial, and (2) there was insufficient evidence to support her conviction for using an unauthorized access device (Count 17). For the reasons set forth below, we **AFFIRM** the district court's judgment as to Counts 1 through 16, **REVERSE** the judgment as to Count 17, and **REMAND** the case for resentencing.

## I.  BACKGROUND

Nixon worked at Pruitt & Thorner Law Offices in Catlettsburg, Kentucky from 2004 to 2007.  An elderly attorney, Garis Pruitt, owned the firm and practiced with his daughter, Lisa Pruitt Thorner Brandenburg.  Nixon started as a legal secretary, but eventually became the firm's paralegal and bookkeeper.  As the bookkeeper, Nixon paid the firm's bills, kept track of the firm's finances in a general ledger, and purchased office supplies.  To pay for the firm's expenses, she had authorized access to the firm's financial accounts, had the authority to sign checks for the firm, and was a signatory on the firm's American Express credit card.  Pruitt relied on Nixon to review the firm's monthly account and to manage the cash flow into, out of, and between the accounts. He testified that Nixon was never authorized to write herself checks from the firm's bank accounts at Community Trust Bank (other than for her own salary) or to use firm funds for personal expenses.

According to Pruitt and Brandenburg, Nixon abused her authority.  In June 2007, just after Nixon left the firm to attend law school, Pruitt was hospitalized for a month due to surgery and treatment for prostate cancer.  Pruitt returned home to recuperate in mid-July, at which time he received a call from Community Trust Bank.  The bank informed him that he was delinquent in paying back his line of credit, a line of credit that he had thought was paid off by Nixon some time ago.  This call led to an investigation into the firm's finances by Pruitt and Brandenburg, and eventually by Robert Rufus,

Ph.D., a forensic accountant. The investigation uncovered that Nixon had made thousands of dollars of personal charges on the firm's credit card and had borrowed thousands more from American Express Bank, all of which was unauthorized according to the testimony of Pruitt and Brandenburg.

Nixon was a Mary Kay cosmetics consultant in her spare time. The undisputed evidence demonstrated that Nixon made charges on the firm's American Express credit card to deposit money in her personal ProPay account with Mary Kay. ProPay is an online company that enables Mary Kay consultants to accept payment from credit cards when selling cosmetics. To charge a client's credit card through ProPay, a consultant logs into her ProPay account online and enters the client's credit card information and the amount of the charge. ProPay then charges the client's credit card the amount specified and deposits that amount, minus ProPay's transaction fee, into the consultant's ProPay account. The consultant can withdraw or transfer cash from her ProPay account as needed, just as one can do with a typical checking account. As a security precaution, ProPay does not allow a consultant to charge any credit card more than $350 at a time and allows no more than $1,000 in charges in any one calendar month.

Nixon used her ProPay account to make eight $350 charges and three $300 charges to the firm's American Express credit card between March and June 2007. Pruitt and Brandenburg testified that they never approved these charges or any of the other personal charges that Nixon had made with the credit card. Nixon used the credit card, for example, to pay for services at a local salon, to book a plane ticket to Las Vegas, to purchase items at Walmart, and to pay off her undergraduate student loan.

In addition, Pruitt and Brandenburg claim that Nixon borrowed funds on behalf of the firm without their permission. First, she borrowed an unspecified amount from an existing $50,000 line of credit at Community Trust Bank. Nixon then opened a line of credit with American Express Bank FSB. She borrowed $19,500 from that line of credit by writing two checks, one for $10,000 and another for $9,500. These checks were deposited in the firm's checking account, allegedly to cover up Nixon's unauthorized use of the firm's credit card. The checks purportedly bore Pruitt's

signature, but Pruitt testified that he had no knowledge of the American Express Bank line of credit and that he never authorized Nixon to write the two checks.

Pruitt eventually informed the United States Attorney's Office of Nixon's actions, which brought the Federal Bureau of Investigation (FBI) into the case. Shortly thereafter, Nixon was indicted on eleven counts of wire fraud, in violation of 18 U.S.C. § 1343 (one count for each credit card charge that ended up in her ProPay account), two counts of bank fraud, in violation of 18 U.S.C. § 1344 (one count for each of the two checks written from the American Express Bank line of credit), three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A (one count for using Pruitt's social security number and signature to set up and use the account at American Express Bank and two counts for each of the checks that she forged in Pruitt's name), and one count of using an unauthorized access device, in violation of 18 U.S.C. § 1029(a)(2) (for charging more than $1,000 on the firm's credit card without authorization). Following a trial, the jury convicted her on all counts. Nixon was subsequently sentenced to 54 months of imprisonment, to be followed by five years of supervised release, and ordered to pay $55,236.30 in restitution. This timely appeal followed.

## II. ANALYSIS

### A.     Opinion testimony of expert witnesses Benjamin Egan and Robert Rufus

In her first challenge to her convictions, Nixon argues that FBI special agent Benjamin Egan and forensic accountant Robert Rufus testified impermissibly as "expert[s] in lay witness[es'] clothing." *See United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (internal quotation marks omitted). Opinion testimony of lay witnesses is strictly limited under Rule 701 of the Federal Rules of Evidence:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [(the rule on expert testimony)].

Fed. R. Evid. 701.  This Rule was redrafted in 2000

to foreclose lay witness testimony "based on scientific, technical, or other specialized knowledge"—testimony more properly given by a qualified expert.  In amending the Rule, the drafters intended to preclude a party from surreptitiously circumventing "the reliability requirements set forth in Rule 702 [of the Federal Rules of Evidence] through the simple expedient of proffering an expert in lay witness clothing" and to "ensure that a party will not evade the expert witness disclosure requirements . . . ."

*White*, 492 F.3d at 400-01 (alterations omitted) (quoting Fed. R. Evid. 701 advisory committee's note).

### 1.    *Standard of review*

We generally review the district court's determinations relating to the admissibility of opinion testimony under the abuse-of-discretion standard.  *Id.* at 398.  If, however, no objection is made to the testimony at trial, then the court's rulings are subject to the more deferential plain-error standard of review.  *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007).  To obtain relief under this latter standard, the party challenging the evidentiary ruling must show that (1) there was an error that (2) was plain, (3) affected a substantial right, and (4) seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  *United States v. Martin*, 520 F.3d 656, 658 (6th Cir. 2008).

Nixon concedes that the district court's admission of Egan's opinion testimony and Rufus's report are both subject to plain-error review because her counsel did not object to the admission of either during the trial.  But she contends that her counsel did properly object when Rufus tried to offer his opinions at trial without being qualified as an expert witness.  The government counters that Nixon's counsel failed to preserve this objection as well.

When Rufus began testifying about the typical behavior of a person who embezzles, Nixon's counsel objected: "I don't think he's qualified to be able to make a generalization as to who commits fraud and things of that effect yet." The district court then told the prosecutor: "If you want to follow this line of questioning, perhaps you need to go ahead and offer [Rufus] and then if [Nixon's counsel] wants to voir dire [Rufus's] qualifications, he can." Following that directive, the prosecutor asked Rufus to detail his certifications in forensic accounting. Nixon's counsel made no further objections to Rufus's testimony.

Rule 103(b) of the Federal Rules of Evidence provides that "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection . . . to preserve a claim of error for appeal." This court has elaborated on the Rule by stating that "if the [district] court's ruling is in any way qualified or conditional, the burden is on counsel to [again] raise objection to preserve [the] error." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). Because the district court made no definitive ruling about Rufus's testimony—e.g., "sustained" or "overruled"—but instead suggested a procedure for the prosecutor to follow to elicit opinion testimony from Rufus, Nixon's counsel had an obligation to reiterate the objection in order to preserve it for appeal. We will therefore review the admission of Rufus's testimony, like the admission of his report and Egan's testimony, under the plain-error standard.

### 2.     *Egan's and Rufus's testimony*

Egan is an FBI financial-crimes investigator who was assigned to investigate Nixon's case. As to the content of Egan's testimony, the government concedes that,

> [t]o a limited extent, Egan . . . offered opinions. He opined that, based on his review of financial statements, Nixon transferred funds from the trust account to the checking account in order to pay credit card bills that could not otherwise have been paid with checking account funds. Similarly, based on Nixon's confession to him, he confirmed his belief that she stole money from Pruitt.

(Citations omitted.) But the government contends that "the vast majority" of Egan's testimony was factual.

Rufus, on the other hand, is a forensic accountant who was hired by Pruitt to investigate Nixon's accounting activities after Pruitt discovered charges to the firm's American Express credit card that he contended were unauthorized. According to Rufus, "[f]orensic accounting is the science where you combine investigative and accounting skills together. . . . It's a very comprehensive analysis." Rufus's own investigative report was admitted into evidence, and he testified as to the conclusions in that report, including that Nixon "converted to her own personal use the firm's lawful money, employing four different methods of embezzlement." The government concedes that "Rufus clearly gave expert opinion testimony under Federal Rule of Evidence 702 on multiple occasions."

But the fact that Egan and Rufus offered testimony stemming from both their personal knowledge and their specialized knowledge is not necessarily improper. Under Rule 702, a witness may give expert testimony only if the witness has the proper qualifications to do so. But a witness may also testify as both a fact witness and an expert witness so long as there is either a cautionary jury instruction regarding the witness's dual roles or a clear demarcation between the witness's fact testimony and expert-opinion testimony. *United States v. Lopez-Medina*, 461 F.3d 724, 745 (6th Cir. 2006). Nixon argues that the district court erred in (1) permitting Egan and Rufus to offer their opinions despite not being formally qualified as experts, (2) admitting the legal conclusions of the two men, and (3) failing to instruct the jury as to the dual nature of their testimony (to the extent that their opinion testimony was admissible).

### a.     *Egan's and Rufus's qualifications to give expert opinion testimony*

Turning to Nixon's first argument, she correctly notes that the district court did not issue a formal ruling that either Egan or Rufus was qualified as an expert witness. But "the district court's failure to make specific findings" regarding the reliability of expert testimony "does not itself require that we vacate the jury's verdict." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006). "If a witness's qualifications are obvious, we have found that there is no need to formally qualify him

as an expert." *United States v. Cobb*, 397 F. App'x 128, 139 (6th Cir. 2010). This court has also held that the proper procedure to rule on the qualifications of an expert witness is not, "in the presence of the jury, [to] declare that a witness is qualified as an expert or to render an expert opinion." *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007) (internal quotation marks omitted). "Instead, the proponent of the witness should pose qualifying and foundational questions and proceed to elicit opinion testimony. If the opponent objects, the court should rule on the objection, allowing the objector to pose voir dire questions to the witness's qualifications if necessary and requested." *Id.* at 698.

The government in this case argues that Egan's qualifications as a special agent charged with investigating financial crimes were "obvious," and therefore the district court did not have to conduct a formal inquiry, sua sponte, into his ability to give an expert opinion. But Egan testified that he had been a special agent for the FBI only since August 2007, just four months before he began working on Nixon's case. Prior to joining the FBI, Egan was an auditor for Deloitte & Touche, a national accounting firm. Although his qualifications could have been stronger, he had a background and training in the field of financial investigations, and he testified that he had handled 20 to 30 cases before Nixon's. Any weaknesses in his qualifications would thus go to the weight rather than the admissibility of his opinion testimony. *See First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001) (holding that a lending expert's unfamiliarity with "some aspects" of lender-borrower relationships "merely affected the weight and credibility of his testimony, not its admissibility"). Indeed, Nixon's counsel cross-examined Egan on his lack of experience.

And even if Egan were not qualified to give an expert opinion, admitting his testimony was not so egregious a mistake as to constitute plain error. Egan had over 70 pages of testimony and very few of his statements arguably constituted expert-opinion testimony.

As for Rufus's opinion testimony, the district court clearly followed the procedure suggested in *Johnson* for qualifying Rufus as an expert. The prosecutor

initially had Rufus discuss his background, including his Ph.D. in business administration with a concentration in accounting, the four years that he had worked for the Internal Revenue Service, and the 24 years that he had run his own accounting firm, Rufus & Rufus Accounting Corp. Rufus also testified that he taught forensic accounting and performed "a lot of fraud research" during his directorship at the University of Charleston's Forensic Institute. After Rufus detailed his professional background, the prosecutor asked Rufus if he could identify behavior that was typical of employees who embezzled from their employers. At that point counsel for Nixon raised an objection to Rufus's opinion testimony, and the following colloquy occurred:

> [NIXON'S COUNSEL]: Your Honor, I'm going to object to this right now, because I don't think [Rufus is] qualified to be able to make a generalization as to who commits fraud and things of that effect yet.
>
> THE COURT: If you want to follow this line of questioning, perhaps you need to go ahead and offer him and then if he wants to voir dire his qualifications, he can.
>
> [THE PROSECUTOR]: Sure.
>
> THE WITNESS: Do you want to get to my certifications as well?
>
> Q. Sure, let's do that. Go through your certifications.
>
> A. As I mentioned earlier, I'm a certified public accountant, have been since 1981. I'm a certified evaluation analyst and have been [since] 1996. I'm a credited fraud investigator, a certified cost analyst. I'm also certified in financial forensics, and I'm also a licensed private investigator.
>
> Q. Let me ask you, all this experience, did you use it in an investigation involving Miss Ronda Nixon?
>
> A. I did, yes.

Nixon's counsel did not object to any of Rufus's opinion testimony following this colloquy, nor did her counsel choose to voir dire Rufus. So even though the district court never explicitly ruled that Rufus had the appropriate qualifications to offer his opinion on matters concerning fraud and embezzlement, the proper procedure for qualifying Rufus was used and, based on Rufus's comprehensive experience in the field and the lack of further objection from Nixon's attorney, such a ruling may be inferred.

*See United States v. Johnson*, 488 F.3d 690, 697-98 (6th Cir. 2007) (holding that the district court should issue rulings on objections to opinion testimony rather than formally declare the witness an expert in the presence of the jury).

Nixon alternatively argues that even if Rufus has the proper expert qualifications, the government failed to demonstrate that his conclusions were a product of principles and methods reliably applied to the facts of the case as required by Rule 702 of the Federal Rules of Evidence. She fails to adequately explain, however, why she believes that Rufus's application of forensic accounting methodology was unreliable. To conclude that the district court committed plain error, we need more than bald assertions that the expert testimony was unreliable, especially when the expert seems otherwise exceedingly well-qualified.

### b.     *Egan's and Rufus's purported legal conclusions*

Nixon next asserts that both Egan's and Rufus's opinion testimony included legal conclusions that were inadmissible because they were "not helpful to the jury within the meaning of Rule 701" of the Federal Rules of Evidence. *See Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) ("Under Rule 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time." (quoting Fed. R. Evid. 701 advisory committee's note)). She argues that Egan should not have been permitted to testify that Nixon "stole money" from Pruitt, that she "forged" Pruitt's signature on the two checks written from the American Express Bank line of credit, or that her actions were in furtherance of a "scheme." Similarly, Nixon contends that the district court plainly erred by permitting Rufus to use the terms "conversion," "embezzlement," and "scheme" in his testimony and report.

"The problem with testimony containing a legal conclusion is in conveying the witness'[s] unexpressed, and perhaps erroneous, legal standards to the jury. This invades the province of the court to determine the applicable law and to instruct the jury as to that law." *Torres*, 758 F.2d at 150 (brackets and internal quotation marks omitted). But this legal-conclusion prohibition must be balanced with Rule 704(a) of the Federal Rules of Evidence, which provides that "[a]n opinion is not objectionable just because

it embraces an ultimate issue."   Accordingly, district courts have a "wide," but not unlimited, "degree of discretion in admitting or excluding testimony [that] arguably contains a legal conclusion." *Torres*, 758 F.2d at 150.

To ascertain whether a witness's testimony contains a legal conclusion, we must "determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *Id.* at 151. A factor in that determination is whether the question posed to the witness or the witness's response tracks the language of the applicable statute. *Id.*   Here, the terms "conversion," "embezzlement," "forged," and "stole" are not used in defining the crimes that Nixon is charged with.   *See* 18 U.S.C. §§ 1028, 1028A, 1343-44.   The word "scheme," however, does appear in 18 U.S.C. §§ 1343 and 1344—the statutes prohibiting wire and bank fraud, respectively—both of which refer to a scheme or artifice to defraud or obtain money by false pretenses.

But Nixon does not assert that the word "scheme" has a separate, distinct, and specialized meaning under §§ 1343 and 1344.  And the jury instructions in this case did not contain a definition of the term, indicating that the jurors were to apply its common meaning rather than a special legal meaning. *See United States v. Sheffey*, 57 F.3d 1419, 1426 (6th Cir. 1995) ("[J]ury instructions are carefully drafted and crafted to rely upon terms commonly used and understood in the vernacular.").   Moreover, Nixon's own counsel used the term "scheme" in several questions that he posed to Egan and Nixon.

Under these circumstances, we cannot say that the district court plainly erred by allowing Egan and Rufus to use the term "scheme" in their testimony.   *See id.* (explaining that "the central holding of *Torres*" is that "if an opinion question posed to a lay witness does not involve terms with a separate, distinct and specialized meaning in the law different from that present in the vernacular, then the witness may answer it over the objection that it calls for a legal conclusion"); *see also United States v. Tolbert*, 8 F. App'x 372, 379 (6th Cir. 2001) (holding that the use of the term "carjacking" by the prosecutor and witnesses was not improper because the term "was used in the vernacular as a short-hand description of the event" at issue, "ha[d] no separate, distinct and

specialized meaning in the law," and was "not even used within the text of the statute" prohibiting the theft of a motor vehicle).

### c.      The district court's failure to give a cautionary instruction

Turning now to the question of whether the district court plainly erred by failing to give a cautionary instruction as to the dual nature of Egan's and Rufus's testimony, the government concedes that, with respect to Egan's testimony, the court plainly erred. This court in *United States v. Lopez-Medina*, 461 F.3d 724 (6th Cir. 2006), held that the failure to give a cautionary instruction when a law-enforcement officer testifies as both an expert and a fact witness, without a clear demarcation between the roles, constitutes plain error. *Id.* at 744-45. But the government contends that because Rufus was not a law-enforcement officer, the court did not plainly err in failing to give such an instruction as to his testimony. Regardless, the government argues that in neither case was the failure to give the instruction so prejudicial as to warrant a new trial.

We conclude that the district court did plainly err in failing to give a cautionary instruction as to the testimony of both men. Even though Rufus was not a law-enforcement officer per se, he was an investigator performing forensic work and therefore fell within the functional scope of *Lopez-Medina*'s holding. *See id.* at 745 ("We conclude that permitting police officers to testify as experts in their own investigations and give opinion testimony on the significance of evidence they have collected, absent any cautionary instruction, threatens the fairness, integrity, and public reputation of judicial proceedings, regardless of whether the defendant is actually innocent.")

The question then becomes whether this error was harmless. A harmless error is one that "does not affect [a defendant's] substantial rights." Fed. R. Crim. P. 52(a). This court has interpreted Rule 52(a) to require remand for a new trial if we determine "that it was more probable than not that the error materially affected the verdict." *United States v. Martinez*, 588 F.3d 301, 312 (6th Cir. 2009). "In determining whether the error

prejudiced the defendant, we examine the entire record." *United States v. Branham*, 97 F.3d 835, 851 (6th Cir. 1996).

This court held in *Lopez-Medina* that the failure to give a cautionary instruction in combination with the improper admission of mug shots and criminal histories of Lopez-Medina's acquaintances required that his conviction be vacated. 461 F.3d at 749. But the finding of prejudice in that case was based primarily on the improper admission of the mug shots and criminal histories, with the court noting that the jury-instruction error merely "buttresse[d] [the] conclusion of prejudice." *Id.*

In this case, because so little of Egan's testimony constituted an opinion and, in contrast, so much of Rufus's testimony did, they each had a great imbalance in their "dual roles." There was thus very little mixing of lay and expert testimony by the same witness, so the jury was unlikely to be confused as to their dual roles. In addition, the evidence against Nixon was overwhelming. She admitted that she conducted the transactions in question, so her defense was essentially that she had permission to borrow most of the funds and had planned to pay Pruitt back. According to Nixon, Pruitt simply forgot that he had authorized many of her personal charges. Nixon conceded, however, that she did not fully discharge her debts to Pruitt and that she failed to get authorization for some of the transactions.

Moreover, in the fact portions of Egan's and Rufus's testimony, they both testified to confessions that Nixon had made to them individually. Egan, for example, testified that Nixon signed a handwritten statement declaring: "I took money from Garis [Pruitt] through the American Express credit card by making false charges. I also took $19,500 from [the] American Express line of credit to help pay the credit card expenses." She did not object to the admission of this statement at trial or on appeal. Egan also testified that Nixon admitted to him that the personal transactions at issue were unauthorized. Rufus similarly testified that Nixon "acknowledged to me [that] she had made some unauthorized credit card charges and willfully took money within her control. . . . She then went on to state the only real issue in her mind was how much." Because of the weight of the other evidence against Nixon, the failure to give a

cautionary instruction was not likely to have materially affected the verdict. We therefore decline to vacate the district court's judgment on this ground.

**B.      Admission of Government Exhibit 19**

In Nixon's second challenge to the judgment, she asserts that Government Exhibit 19 was erroneously admitted. The exhibit, a spreadsheet containing Nixon's ProPay account records, was used to demonstrate that Nixon made 11 unauthorized charges on the firm's American Express credit card that resulted in deposits to her ProPay account. David England, the manager of the fraud-resolutions department at ProPay, testified about the activity in Nixon's ProPay account during the period that she was employed at the firm. He explained that ProPay stores all information for individual accounts in an electronic database located in Utah. ProPay does not issue periodic account statements to its customers, so when Nixon's account information was subpoenaed by the government, England utilized database-querying software to retrieve Nixon's account information.

When England entered Nixon's account number into the querying software, the account data were displayed in a spreadsheet on his computer screen. Exhibit 19 is the printed screen shot of that spreadsheet. The exhibit shows the following information pertaining to Nixon's account: the date and time of each transaction, descriptions of those transactions, the amounts of those transactions, and the balance of the account following each transaction. Exhibit 19 was admitted under the business-record exception to the hearsay rule as set forth in Rule 803(6) of the Federal Rules of Evidence.

Nixon claims that the district court erred in admitting Exhibit 19 into evidence. According to the government, Nixon is correct in her assertion that the district court committed an "obvious error" by admitting Exhibit 19 under the business-records exception to the hearsay rule. The government argues, however, that Exhibit 19 was admissible under Rule 1006 of the Federal Rules of Evidence, which provides that a party "may use a summary" of "voluminous writings . . . that cannot be conveniently examined in court."

Despite the government's concession, we conclude that the district court neither made an obvious error nor abused its discretion in admitting Exhibit 19 under the business-record exception. *See United States v. Cunningham*, 679 F.3d 355, 382 (6th Cir. 2012) ("A district court's evidentiary rulings will generally not be reversed unless the court abused its discretion."). A document may be admitted under Rule 803(6) if it satisfies four requirements: (1) it was "made in the course of regularly conducted business activities;" (2) it was "kept in the regular course of business;" (3) "the regular practice of that business must have been to have made the [document]"; and (4) the document was "made by a person with knowledge of the transaction or from information transmitted by a person with knowledge." *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009). The advisory committee to the Federal Rules of Evidence made the following pertinent remarks about dealing with the admission of electronically stored data under Rule 803(6):

> The form which the "record" may assume under the rule is described broadly as a "memorandum, report, record, or data compilation, in any form." The expression "data compilation" is used as broadly descriptive of any means of storing information other than the conventional words and figures in written or documentary form. It includes, but is by no means limited to, electronic computer storage. The term is borrowed from revised Rule 34(a) of the Rules of Civil Procedure.

Fed. R. Evid. 803 advisory committee's note.

Both Nixon and the government agreed that because England printed the document that became Exhibit 19 in response to a subpoena, Exhibit 19 was created for the purposes of litigation and not as a part of ProPay's regularly conducted business activities. But they overlooked the fact that all the information on Exhibit 19 was kept in ProPay's electronic database. England had to print out the records pertaining to Nixon in order to produce them for the subpoena, but the electronic version of those records were created and kept in the regular course and practice of ProPay's business operations.

Although there is an argument to be made that Exhibit 19 is a summary under Rule 1006 and not a business record, a similar argument has already been rejected by

this court.  In *United States v. Moon*, 513 F.3d 527 (6th Cir. 2008), Moon challenged the district court's admission of printouts of electronically stored purchase records from several pharmaceutical companies that documented Moon's purchases of their products. Moon argued that these records were inadmissible as summaries under Rule 1006.  But this court held that the printouts were business records, not summaries, noting that "Rule 803(6) specifically allows the admission of data compilation in any form."  *Id.* at 545 (internal quotation marks omitted).

The court in *Moon* relied on the reasoning of *United States v. Russo*, 480 F.2d 1228 (6th Cir. 1973), for its holding.  In *Russo*, a doctor accused of defrauding an insurance company by billing for procedures not performed on patients objected to the admission of the printout of a 1967 annual statistical survey created by Blue Shield of Michigan.  The district court found that the survey was a business record.  This court affirmed the ruling, holding that "once the reliability and trustworthiness of the information put into the computer has been established, the computer printouts should be received as evidence of the transactions covered by the input."  *Id.* at 1240.  The testimony at trial showed that the survey was regularly kept and maintained in electronic form and "the computer printout is just a presentation in structured and comprehensible form of a mass of individual items."  *Id.*  This court held that "it is immaterial that the printout itself was not prepared until 11 months after the close of the year 1967."  *Id.*

England testified that the electronic records pertaining to Nixon, like those in *Moon* and *Russo*, were kept in the regular course of business and maintained in a reliable and secure computer database.  Had they been produced in their electronic form, they would clearly be admissible under the business-record exception.  *Moon* and *Russo* hold that the simple act of printing out the electronically stored records does not change their status for admissibility.  The district court, therefore, did not err in admitting Exhibit 19.

## C.     Exclusion of testimony about Pruitt's forgetfulness

Nixon's third challenge addresses the district court's exclusion of defense witness Michael Curtis's testimony.  Generally, we review the exclusion of testimony, like other evidentiary rulings, under the abuse-of-discretion standard.  *United States v.*

*Hanna*, 661 F.3d 271, 288 (6th Cir. 2011). "An abuse of discretion occurs when the lower court relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *United States v. Heavrin*, 330 F.3d 723, 727 (6th Cir. 2003) (internal quotation marks omitted). At trial, Nixon testified that Pruitt had authorized several of her personal charges on the firm's American Express credit card and on the line of credit with American Express Bank, but that he had forgotten that he had done so as a result of his advanced age and his health issues. As support for her defense, Nixon offered the testimony of Michael Curtis, an attorney and longtime colleague of Pruitt. She claims that Curtis would have testified that Pruitt forgot Curtis's name at a deposition unrelated to this case that occurred a short time before Nixon's trial.

The district court, however, ruled that Curtis's proposed testimony was barred by Rule 608(b) of the Federal Rules of Evidence, which prohibits the admission of extrinsic evidence to prove "[s]pecific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). Such reliance on Rule 608(b) was mistaken, as the government concedes, because Rule 608 applies only to extrinsic evidence that impeaches a witness's character for truthfulness, but "leaves the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) to Rules 402 and 403." Fed. R. Evid. 608 advisory committee's note.

The government argues that the exclusion of Curtis's testimony was nevertheless proper under Rule 404(b) of the Federal Rules of Evidence. Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," except that in criminal cases such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

Nixon, on the other hand, contends that Curtis's testimony was admissible under Rules 404(a)(2)(B) and 405(b) of the Federal Rules of Evidence. Rule 404(a)(2)(B)

permits a defendant in a criminal case to "offer evidence of an alleged victim's pertinent trait." And Rule 405(b) provides that "[w]hen a person's . . . character trait is an essential element of a charge, claim, or defense, the . . . trait may also be proved by relevant specific instances of the person's conduct." Because Nixon never raised either Rule at trial as a basis for admitting Curtis's testimony, the government argues that the district court's failure to admit the testimony should be reviewed under the plain-error standard. We need not decide whether the plain-error standard of review applies here, however, because we conclude that the district court's decision withstands attack even under the less-deferential abuse-of-discretion standard.

We disagree with both the district court's conclusion and the parties' assertion that forgetfulness is a character trait. Although this court has never ruled on the issue, other circuits have determined that the term "character trait" does not encompass a witness's memory or mental capacity. *See United States v. Cortez*, 935 F.2d 135, 138-39 n.3 (8th Cir. 1991) ("We do not believe that Rule 404(a)(1) encompasses slowness to answer, forgetfulness, or poor ability to express oneself . . . ."); *see also United States v. West*, 670 F.2d 675, 682 (7th Cir. 1982) (noting that although Rule 404(a)(1) does not define the term "character trait," the term more properly references "elements of one's disposition, such as honesty, temperance, or peacefulness," rather than one's "intelligence" (internal quotation marks omitted)), *overruled on other grounds by United States v. Green*, 258 F.3d 683 (7th Cir 2001). We find our sister circuits' analysis on this issue persuasive, and thus conclude that forgetfulness is not a character trait.

Nonetheless, we agree with the district court's decision to exclude Curtis's testimony because his testimony was irrelevant. *See U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 330 F.3d 747, 750 (6th Cir. 2003) ("We may affirm a decision of the district court if correct for any reason, including one not considered below."); *see also* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

In this case, the quality of Pruitt's memory at or around the time that Nixon made the transactions (March to June 2007) was certainly a fact of consequence. But Curtis could testify as to Pruitt's memory only in the time period immediately before Nixon's trial (May 2010), nearly three years after the last transaction was made. In addition, Curtis's proposed testimony was not going to show a pattern of Pruitt's forgetfulness, but only that Pruitt had a single memory lapse that was unrelated to any financial or business transaction. Accordingly, we conclude that Curtis's testimony about an isolated incident three years after the time period at issue was irrelevant. The district court, therefore, did not err in excluding the testimony.

**D.      Constructive amendment to or variance from the superseding indictment**

Nixon's fourth challenge asserts that her trial was tainted by a constructive amendment to—or, alternatively, a variance from—the superseding indictment when the government presented evidence purportedly outside the scope of the crimes charged. Nixon argues that the combination of that evidence with an ambiguous jury instruction allowed the jury to convict her of crimes that were not charged in the indictment. She concedes that this issue should be reviewed under the plain-error standard because her counsel never objected to the evidence or to the jury instruction below.

"The Fifth Amendment guarantees that an accused be tried only on those offenses presented in an indictment and returned by a grand jury." *United States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998). A constructive amendment occurs

> when the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment.

*United States v. Siemaszko*, 612 F.3d 450, 469-70 (6th Cir. 2010) (internal quotation marks omitted). Nixon "bears the burden of establishing that a constructive amendment has occurred." *See id.* at 469. "[C]onstructive amendments are considered per se

prejudicial and are reversible error." *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007).

A variance, on the other hand, is a violation of the Sixth Amendment right of a defendant "[i]n all criminal prosecutions . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. "In contrast to an amendment, a variance occurs when the charging terms are unchanged, but the evidence at a trial proves facts materially different from those alleged in the indictment." *United States v. Nance*, 481 F.3d 882, 886 (6th Cir. 2007) (internal quotation marks omitted). "A variance is not reversible error unless the defendant demonstrates prejudice." *Id.* But if a variance is "serious enough, it *becomes* a constructive amendment." *Budd*, 496 F.3d at 521 (emphasis in original). This situation occurs "only when the variance creates a substantial likelihood that a defendant may have been convicted of an offense other than that charged by the grand jury." *Nance*, 481 F.3d at 886 (internal quotation marks omitted).

As her specific basis for asserting that a constructive amendment or variance occurred, Nixon argues that the government improperly presented evidence about several checks from the firm's Community Trust Bank account that she allegedly altered or otherwise illegitimately issued, even though she was never charged with any bank fraud stemming from checks drawn on that account. Nixon was accused of fraud only with respect to the firm's account with the American Express Bank. She claims that the evidentiary error coupled with the jury instruction on the two bank-fraud counts (Counts 12 and 13) constituted a constructive amendment or variance. The district court charged the jury with the following instruction on Counts 12 and 13:

> The defendant is charged in Counts 12 and 13 of the indictment with the crime of bank fraud in violation of federal law. For you to find the defendant guilty of bank fraud, you must find that the government has proved each and every one of the following elements beyond a reasonable doubt.
>
> One, that the defendant knowingly executed a scheme to defraud a financial institution to obtain money by means of false or fraudulent pretenses, representations or promises.

Two, that the scheme included a material representation or concealment of a material fact.

Three, that the defendant had the intent to defraud.

Four, that the financial institution was federally insured.

Because the "financial institution" was never specified, Nixon contends that the jury could have erroneously convicted her on Counts 12 and 13 due to the checks that she wrote from the Community Trust Bank account.

This assertion is without merit, however, because the jurors were given a copy of the superseding indictment when they deliberated. The superseding indictment states that Counts 12 and 13 stem from Nixon's unauthorized withdrawal of money by check from the American Express Bank line of credit. A chart contained in the superseding indictment shows that Count 12 involves the withdrawal of $10,000 from the American Express Bank on January 12, 2007 and Count 13 involves the withdrawal of $9,500 from the American Express Bank on February 21, 2007. There was no evidence presented at trial showing that these amounts were withdrawn from the Community Trust Bank on those dates, but there was ample testimony and more than one exhibit demonstrating that Nixon cashed checks from the American Express Bank on those dates in the exact amounts set forth in the superseding indictment.

Moreover, an element of the bank fraud charged in Counts 12 and 13 is that the bank must be federally insured. Only the American Express Bank was proven to be federally insured. There was no evidence presented at trial as to the insured status of the Community Trust Bank. The likelihood that the jury was confused as to which bank was the "financial institution" referred to in the instructions for Counts 12 and 13 was thus exceedingly low. Nixon has therefore failed to demonstrate that the district court committed plain error by admitting testimony about the Community Trust Bank checks and neglecting to specify the "financial institution" in the jury instructions.

**E.     "Unauthorized access device"**

Nixon's final challenge relates to her conviction on one count of using an unauthorized access device, in violation of 18 U.S.C. § 1029(a)(2) (Count 17), for her improper use of the firm's American Express credit card. The government concedes that it failed to present evidence at trial that the card was an "unauthorized access device." The term is defined under the statute as "any access device that is lost, stolen, expired, revoked, cancelled, or *obtained with intent to defraud*."   18 U.S.C. § 1029(e)(3) (emphasis added).

Key to the charged offense is that the intent to defraud be present both when the "access device" is *obtained* and when it is later *used*. *United States v. Tunning*, 69 F.3d 107, 113 (6th Cir. 1995).  Here, the uncontradicted proof established that Pruitt had authorized Nixon to obtain the American Express credit card for his firm's use.  Because there was no proof at trial that Nixon had the intent to defraud Pruitt or the firm at the time she obtained the credit card (as opposed to her later unauthorized use of the card), the government did not prove an essential element of the crime.  The government therefore concedes that the judgment on Count 17 must be reversed and the case remanded for resentencing.

### III.  CONCLUSION

Although we agree that the trial in this case was not perfect, we abide by the Supreme Court's edict that "[a] defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials."  *Brown v. United States*, 411 U.S. 223, 231-32 (1973) (internal quotation marks omitted).  For all the reasons set forth above, we therefore **AFFIRM** the district court's judgment as to Counts 1 through 16, **REVERSE** the judgment as to Count 17, and **REMAND** the case for resentencing.