**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0768n.06

Nos. 12-5183/12-5199/12-5202/12-5272

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Aug 16, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| RAY VANCE MATHEWS (12-5183), | ) | **O P I N I O N** |
| JAMES POTEETE (12-5199), | ) | |
| RACHEL MATHEWS (12-5202), | ) | |
| and KATHLEEN MATHEWS (12-5272), | ) | |
| | ) | |
| *Defendants-Appellants*. | ) | |
| | ) | |

BEFORE:    COLE and MCKEAGUE, Circuit Judges; ZOUHARY, District Judge.[*]

PER CURIAM.  Defendants-Appellants Ray Vance Mathews, James David Poteete, Rachel Mathews and Kathleen Mathews helped Jesse Mathews in his attempts to avoid detection and prosecution after a series of robberies.  They pleaded guilty to conspiracy to obstruct justice, accessory after-the-fact to a Hobbs Act robbery, and accessory after-the-fact to brandishing a gun in relation to a crime of violence.  Ray and Kathleen Mathews also pleaded guilty to transferring firearms to a known felon.  All four Defendants appeal the district court's decision to apply a cross-reference to first-degree murder during their sentencing on the conspiracy charge and to run their sentences for accessory after-the-fact to brandishing a gun in relation to a crime of violence

---

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

consecutively to the other sentences. Ray and Kathleen Mathews separately appeal the district court's decision to apply a relevant-conduct cross-reference to murder when sentencing them for accessory after-the-fact to a Hobbs Act robbery and transferring firearms. Because Defendants' appeals are barred by the appellate waivers in their plea agreements, the appeals must be dismissed.

I.

A.

In 2011, Jesse Mathews went on a crime spree, with some after-the-fact assistance from his parents, Ray and Kathleen Mathews, his sister, Rachel Mathews, and his sister's boyfriend, James David Poteete. He began on January 22, 2011, by robbing a Carl's Jr. Restaurant in Colorado Springs, Colorado. The following month, Jesse robbed the Cash America Pawn Store ("Pawn Store") in Colorado Springs, taking sixteen firearms, among other things. Three days later, he robbed a Walgreens Pharmacy in Colorado Springs. He brandished a firearm during all three robberies.

Shortly after the robberies, Jesse absconded from the halfway house where he was on parole for a prior robbery conviction. He wired money to Rachel, enabling her to fly to Colorado that same day to help him. Rachel and Jesse's girlfriend moved with him from hotel to hotel and bought him food. Afterwards, Rachel bought Jesse and his girlfriend bus tickets to Nashville.

When Jesse and his girlfriend arrived in Nashville, James picked them up at the bus station and—for $1,000—drove them to Asheville, North Carolina, where the group met up with Ray and Kathleen. Jesse told his parents that he was a fugitive and had committed the Colorado Springs robberies. Kathleen rented a hotel room at a Microtel Inn in Chattanooga, Tennesee, under a false

name and told the Colorado Department of Corrections that she had not seen Jesse when they called her. On or about March 16, James and Jesse came to Chattanooga to help Ray and Kathleen move into a house. Among other things, James moved a bulletproof vest into the house. Jesse also moved into the house, with a new girlfriend. On or about March 27, Jesse called Ray and said to "bring the family collection" to a gun show in Chattanooga. Ray and Kathleen gave Jesse ten to twelve firearms, which were from the Pawn Store robbery. Jesse traded three of these firearms for an M-4 assault rifle at the gun show.

On the morning of April 2, Jesse tried to rob the U.S. Money Shops store in Chattanooga, but was foiled by police. Wearing a bulletproof vest, Jesse shot and killed Chattanooga Police Department ("CPD") Sergeant Tim Chapin. At the scene, CPD recovered two firearms—from the Pawn Store robbery—from Jesse's person and the M-4 from his girlfriend's car. Later that day, CPD recovered two more stolen guns from Jesse's belongings stored at his girlfriend's house. The next day, they recovered ammunition from Ray and Kathleen's house and car.

On April 4, Kathleen gave Rachel and James a key to a Chattanooga storage unit and told them to remove the firearms inside. They took out "at least six" firearms—four of which were from the Pawn Store robbery—and brought them to James's residence in Antioch, Tennessee. Two days later, Rachel called James and told him to get rid of the firearms. He did. Kathleen then called James to warn him that the ATF and/or FBI knew he had the firearms and were coming to retrieve them. James wiped the firearms to conceal his fingerprints. The ATF recovered them.

B.

After Defendants were apprehended, a federal grand jury returned a thirteen-count indictment charging them, in several combinations, with various crimes. Four counts are relevant here, with the first three described as taking place "between in or about February 2011 . . . through . . . about April 6, 2011." (R.11, PageID # 73-75.) :

> [Count One:] [All four Defendants] . . . conspired to obstruct justice by corruptly concealing firearms stolen and possessed by Jesse Mathews, with intent to impair the firearms' integrity and availability for use in official proceedings, that is, the federal prosecution of Jesse Mathews for the offenses of Hobbs Act robbery, possession of a firearm during and in relation to a crime of violence, and felon in possession of a firearm; in violation of [18 U.S.C. § 1512(k)].

> [Count Two:] [All four Defendants], aided and abetted by one another, knowing that an offense against the United States had been committed, that is, the Hobbs Act robbery of the Cash America Pawn Store . . . , in violation of [18 U.S.C. § 1951], did receive, relieve, comfort, and assist the offender, Jesse Mathews, in order to hinder and prevent the offender's apprehension, trial and punishment; in violation of [18 U.S.C. §§ 2, 3].

> [Count Three:] [All four Defendants], aided and abetted by one another, knowing that an offense against the United States had been committed, that is, the using and carrying of a firearm during and in relation to the robbery of the Cash America Pawn Store . . . , in violation of [18 U.S.C. § 924(c)], did receive, relieve, comfort, and assist the offender, Jesse Mathews, in order to hinder and prevent the offender's apprehension, trial and punishment; in violation of [18 U.S.C. §§ 2, 3].

> [Count Eight:] On or about March 27, 2011, . . . [Kathleen and Ray], aided and abetted by one another, knowingly transferred firearms to Jesse Mathews, knowing and having reasonable cause to believe that he had been convicted of a crime punishable by imprisonment for a term exceeding one year; in violation of [18 U.S.C. §§ 2, 922(d)].

All four Defendants pleaded guilty to Counts One, Two, and Three, and Ray and Kathleen also pleaded guilty to Count Eight. Their plea agreements all included the same waiver provision:

> In consideration of the concessions made by the United States in this agreement and as a further demonstration of the defendant's acceptance of responsibility for the

offenses committed, the defendant agrees not to file a direct appeal of the defendant's conviction or sentence except the defendant retains the right to appeal a sentence imposed above the sentencing guideline range or any applicable mandatory minimum sentence (whichever is greater) determined by the district court.

In exchange, the government dismissed the remaining nine counts in the indictment and agreed not to oppose a two-level acceptance-of-responsibility reduction, *see* U.S.S.G. § 3E1.1(a), and to move for an additional one-level reduction pursuant to § 3E1.1(b) under certain conditions. After the plea agreements were signed and plea colloquies completed, the probation officer prepared presentence reports calculating Defendants' guidelines ranges. His calculations and cross-references, which the court adopted, are the focus of Defendants' challenges to the sentences for Counts One, Two and Eight.

For Count One, the calculation began with a base offense level of 14 pursuant to § 2J1.2(a), and added three levels because Defendants' actions substantially interfered with the administration of justice, *see* § 2J1.2(b)(2). Then, the court applied § 2J1.2(c)(1), which requires "appl[ication of] § 2X3.1 (Accessory After the Fact) in respect to that criminal offense [whose investigation or prosecution the defendant obstructed]." The court determined that, in light of the Chattanooga shooting, first-degree murder should be the underlying offense, which led to a base level of 30, *see* § 2A1.1. The presentence report explained:

> Multiple crimes were committed during [the] time frame [of the conspiracy], the most severe of which was First Degree Murder. The defendant did obstruct the investigation into that murder.

For Count Two, the court again applied § 2X3.1, which calls for a base offense level six levels below that of the "underlying offense," which was deemed to be the Hobbs Act robbery. This

led to a base offense level of 14, to which the court added three levels for the number of firearms and amount of money taken in the robbery. Then, for Ray and Kathleen only, the court cross-referenced § 1B1.3(a)(1) (Relevant Conduct), which states that "in the case of a jointly undertaken criminal activity," the base level shall be determined based on, among other things, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." The presentence report elaborated:

> [Ray and Kathleen] . . . supplied Jesse [] with weapons. Then, in furtherance of receiving those weapons, Jesse [] commits another robbery in which he [kills a police officer and wounds another] . . . .

> Thus, when family members of a convicted armed robber, who is on escape status, who has committed three armed robberies, who is avoiding apprehension, and has a lifetime history of being violent, harbors that family member (armed robber), and provides him with weapons, they should also be held accountable for further acts of violence caused by those family members' actions. It should have been reasonably foreseeable to his parents that their actions could have resulted in further acts of violence, or even death as in this case.

Accordingly, the court re-calculated the base offense level using first-degree murder as the underlying offense, *see* § 2A1.1, which led to a base offense level of 43. After a two-level minor-participant reduction, *see* § 3B1.2(b), the adjusted offense levels for Ray and Kathleen were set at 41 on Count Two.

For Count Three, the court again applied § 2X3.1, this time identifying the underlying offense as the brandishing of a firearm in relation to a crime of violence, which requires the application of § 2K2.4(b). For brandishing a firearm this way, the guidelines dictate a sentence equal to the minimum statutory prison term of seven years. *See id.*; 18 U.S.C. § 924(c)(1)(A)(ii). The presentence report noted that a sentence under 18 U.S.C. § 924(c) must run consecutively to any

other sentence, *see* 18 U.S.C. § 924(c)(1)(D)(ii), but that in this case, since the sentence was under

18 U.S.C. § 3, the district court had the discretion to run the sentence either concurrently or

consecutively.  A violation of 18 U.S.C. § 3 is punishable by not more than half the maximum term

of imprisonment for the underlying offense, so the suggested sentence for Count Three was reduced

from seven years to three and a half years.

For Count Eight, *see* 18 U.S.C. § 922(d), the court applied § 2K2.1(a)(6)(B), to reach a base

offense level of 14.  It added two levels because the firearms were stolen and four levels for the

number of firearms involved, for an adjusted offense level of 20.  Then, the court cross-referenced

§ 1B1.3, just as for Ray and Kathleen in Count Two, with a similar explanation in the presentence

report:

> The guns involved with this count of conviction . . . are also some of the same
> weapons used by [Jesse] to kill [the CPD officer] and wound another officer. . . .
>
> Thus, when family members of a convicted armed robber, who is on escape status,
> who has committed three armed robberies, who is avoiding apprehension, and has a
> lifetime history of being violent, harbors that family member (armed robber), and
> provides him with weapons, they should also be held accountable for further acts of
> violence caused by those family members' actions.  It should have been reasonably
> foreseeable to his parents that their actions (transferring weapons to Jesse Mathews)
> could have resulted in further acts of violence, or even death, as in this case.

The cross-reference set the base offense level to 43.  The court granted a minor-role reduction of two

levels for both Ray and Kathleen, rendering an adjusted offense level of 41 for Count Eight.

The district court separated Count Three from the remaining counts, which were grouped

together for each Defendant, and chose to have the sentence run consecutively.  For Ray and

Kathleen—after a three-level acceptance-of-responsibility reduction—the resulting adjusted offense

level was 38 for Counts One, Two and Eight. James and Rachel wound up with an adjusted offense level of 27 for Counts One and Two, also after an acceptance-of-responsibility reduction.

Defendants objected to these calculations. First, Ray objected to the three-level increase for substantial interference with administration of justice. Second, he objected to the decision to cross-reference murder. Third, he objected to running the Count Three sentence consecutively instead of concurrently. Finally, he objected to the slain officer's family members speaking in court during his sentencing. James made the same four objections. Rachel and Kathleen both made Ray's second, third and fourth objections. Rachel additionally objected that all the counts should have been grouped. Kathleen objected that she should not owe any restitution. The government objected to the acceptance-of-responsibility adjustment recommended for Kathleen, due to letters she had written arguably evidencing a lack of remorse. The government also moved to reduce James's sentence for his substantial assistance.

The district court rejected Defendants' objections, granted both of the government's requests, and calculated each Defendant's guidelines range accordingly before considering other factors pursuant to 18 U.S.C. § 3553(a). None of the resulting sentences was above the guidelines range, and two were below.

Defendants timely appeal.

## II.

All four Defendants argue that the district court's first-degree-murder cross-reference effected a constructive amendment or variance to their indictments for Counts One, an error of sufficient gravity to qualify as a miscarriage of justice that warrants non-enforcement of their appellate

waivers. Ray and Kathleen Mathews make the same argument regarding their relevant-conduct first-degree-murder cross-references for Counts Two and Eight. James Poteete and Kathleen Mathews argue that the imposition of a consecutive sentence for Count Three was a miscarriage of justice.

We review de novo whether Defendants waived their right to appeal their sentences. *United States v. McGilvery*, 403 F.3d 361, 362 (6th Cir. 2005) (citation omitted). Since the waivers were part of Defendants' plea agreements, we must interpret them according to traditional contract law principles. *See United States v. Bowman*, 634 F.3d 357, 360 (6th Cir. 2011). Because of the constitutional issues involved, the government bears a higher degree of responsibility than Defendants—the agreement is construed narrowly and all ambiguities are construed against the government. *Id.* at 360-61.

A.

All of Defendants' claims are precluded by the terms of the appellate waivers, if the waivers are enforceable. Defendants knowingly and voluntarily entered into their respective plea agreements containing the waivers.[1] No Defendant's sentence fell into the single exception to the waiver because none was "above the sentencing guideline range or any applicable mandatory minimum sentence (whichever is greater) determined by the district court." *See United States v. Beals*, 698 F.3d 248, 255 (6th Cir. 2012) ("Reasonably read, this language defers to the district court's discretion in calculating [the guidelines] range and permits [the defendant] to challenge the resulting sentence

---

[1]Only Kathleen challenges the waiver on the grounds that it was not "knowing and voluntary." However, it is clear that she challenges the scope of the waiver rather than any lack of knowledge or consent as to its terms.

only if it exceeds the top end of the range *the court calculates.*" (emphasis added)).  However, an

appellate waiver does not divest this Court of jurisdiction, *see  United States v. Caruthers*, 458 F.3d

459, 472 n.6 (6th Cir. 2006), and we do not indiscriminately enforce all appellate waivers.

B.

Under "limited circumstances," even a knowingly-entered, otherwise-valid appellate waiver

will not bar a defendant's challenge to her sentence.  *United States v. Ferguson*, 669 F.3d 756, 764

(6th Cir. 2012).  In *Caruthers*, we held that an appellate waiver cannot bar an appeal on the ground

that the sentence exceeds the statutory maximum.  *Id.* at 471 (collecting cases).  We examined a

variety of rationales—jurisdiction, due process, miscarriage of justice, and unconscionability—for

the  holding, but ultimately declined to choose one.  *Id.* at 472.  We have also recognized racial

discrimination as warranting review on the merits, despite the presence of an appellate waiver.  *See*

*Ferguson*, 669 F.3d at 764.

While we have not elaborated on the criteria by which we identify the "limited

circumstances" under which an appellate waiver may be ignored, other circuits primarily use a

miscarriage-of-justice rationale.  *See United States v. Harris*, 628 F.3d 1203, 1205 (9th Cir. 2011);

*United States v. Guillen*, 561 F.3d 527, 531 (D.C. Cir. 2009); *United States v. Gwinnett*, 483 F.3d

200, 203 (3d Cir. 2007); *United States v. Hahn*, 359 F.3d 1315, 1325, 1327 (10th Cir. 2004); *United*

*States v. Andis,* 333 F.3d 886, 889-90 (8th Cir. 2003); *United States v. Teeter*, 257 F.3d 14, 25 (1st

Cir. 2001); *United States v. Jordan*, 438 F. App'x 180, 181 (4th Cir. 2011).

Although we have never expressly recognized the miscarriage-of-justice exception to the

enforcement of appellate waivers in a published decision, we have implicitly recognized it in several

unpublished decisions. *See United States v. Lee*, 464 F. App'x 457, 458 (6th Cir. 2012) (per curiam) (enforcing appellate waiver in part because doing so "will not result in a miscarriage of justice"); *United States v. Hower*, 442 F. App'x 213, 215 (6th Cir. 2011) (noting that "[no] miscarriage of justice [will] occur if the sentence is not reviewed" (citing *Gwinnett*, 483 F.3d at 203)); *United States v. Jones*, 425 F. App'x 449, 456 (6th Cir. 2011) (describing the defendant's miscarriage-of-justice argument as "correct regarding the well-settled principle [that sentencing cannot be at the district court's whim]" but finding that "his . . . challenges do not rise to the level that this principle contemplates" (citing *Caruthers*, 458 F.3d at 471)). Regardless of whether the miscarriage-of-justice exception applies to constructive amendments and variances, Defendants' claim would still fail because no constructive amendment or variance occurred in this case.

C.

The Fifth Amendment prevents a defendant from being tried on "charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 216 (1960) (citation omitted); *see United States v. Nixon*, 694 F.3d 623, 637 (6th Cir. 2012). In the absence of an actual change to the text of the indictment, a court may still effectively "destroy[] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury" by a constructive amendment or a variance. *See Stirone*, 361 U.S. at 217.

The difference between a constructive amendment and a variance is "at best shadowy." *United States v. Zelinka*, 862 F.2d 92, 97 (6th Cir. 1988) (internal quotation marks omitted). "A variance occurs when the charging terms of an indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment. . . . [A defendant] can

establish a variance by referring exclusively to the evidence presented at trial." *United States v. Hynes*, 467 F.3d 951, 961, 962 (6th Cir. 2006) (citation omitted). A constructive amendment occurs when a combination of evidence *and* jury instructions "so modify essential elements of the offense charged that there is a substantial likelihood the defendant was convicted of an offense other than that charged in the indictment." *Id.* at 962 (citations omitted).

We are unaware of any precedent that characterizes a misapplication of the Sentencing Guidelines as a constructive amendment or variance of the indictment. Constructive amendments and variances are identified by reference to the evidence, theories of the crime, and jury instructions presented at trial, prior to conviction. *See United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002); *Hynes*, 467 F.3d at 962. Defendants also cite *United States v. Thompson*, 515 F.3d 556 (6th Cir. 2008), where we found that the district court's sentence impermissibly departed from the indictment during sentencing. However, in *Thompson* the district court misapplied the statute governing the crime, not merely the Guidelines. *See id.* at 567 (vacating defendant's sentence under 18 U.S.C. § 924(c)(1)(A)(iii) and directing the district court to consider a sentence under § 924(c)(1)(A)(i) or 924(c)(1)(A)(ii) on remand).

Even assuming, for the purpose of argument, that the district court clearly erred in finding the Chattanooga murder to be an offense, the investigation or prosecution of which Defendants obstructed, *see* U.S.S.G. § 2J1.2(c)(1), which requires "appl[ication of] § 2X3.1 . . . in respect to that criminal offense [whose investigation or prosecution the defendant obstructed]," this would still be merely a misapplication of the guidelines. Unlike the statutory error in *Thompson*, this alleged error did not impose a higher statutory mandatory minimum sentence than the offense in the

indictment. Nor did it result in a final sentence above the statutory maximum for the offense in the indictment. A district court's supposed misreading of the demands of the guidelines is the sort of error anticipated by the appellate waivers in this case and does not come within the exception reserved in the waivers.

D.

Ray and Kathleen Mathews separately challenge the relevant-conduct cross-references to murder that the district court applied in sentencing them for Counts Two and Eight. *See* U.S.S.G. § 1B1.3. Ray argues that the murder was not relevant conduct because it was not (1) "in furtherance" of the "only" jointly undertaken criminal activity—concealing Jesse from law enforcement—but actually counterproductive to the joint purpose; and (2) foreseeable because it undermined the joint goal of keeping Jesse's whereabouts concealed. *See* § 1B1.3(a)(1). Even so, because relevant conduct need not be contained in an indictment, *see United States v. Shafer*, 199 F.3d 826, 830 (6th Cir. 1999), the relevant-conduct cross-references did not amend or vary the indictment.

Even if the district court erred as to the foreseeability and utility of the murder in choosing to apply the relevant-conduct cross-reference, such errors would not constitute a miscarriage of justice. Foreseeability and intent determinations are fact-intensive and tricky. *Cf. James v. Meow Media, Inc.*, 300 F.3d 683, 693 (6th Cir. 2002) ("Foreseeability . . . is a slippery concept."); *United States v. Dudley*, 451 F.2d 1300, 1303 (6th Cir. 1971) (describing questions of intent as "thorny"). This alleged error is of the sort that Defendants should have anticipated when they bargained away their appeal rights, not an extraordinary miscarriage of justice.

E.

Poteete and Kathleen Mathews also contend that a miscarriage of justice occurred when the district court determined that their sentences for Count Three would run consecutively to their sentences for the other counts, which run concurrently. They allege that the district court erred by assuming that Count Three *must* run consecutively to the other counts, even though the statute leaves the decision to the discretion of the district court. *See* 18 U.S.C. § 3. We do not have to decide whether such an error would constitute a miscarriage of justice because it did not occur in this case.

The district court acknowledged that the sentence for Count Three could run concurrently or consecutively, but chose to have it run consecutively:

> Mr. Martinez: [I]n no way is the probation officer making the argument that the sentence imposed to Count 3 must be run consecutively.
>
> The Court: Oh, I think that's clear. I agree. I have the discretion to do it.
>
> Mr. Martinez: Right. The belief is that this decision is up to the Court.
>
> . . . .
>
> The Court: [T]he Court can find no reason because Congress has expressed its will in the underlying statute that is 18 U.S.C. Section 924(c) that based upon the stand-alone statute that sentences under that statute are to be imposed consecutively to any other sentence imposed. The fact that this one, that the reference to 924(c) is coming in pursuant to an aiding and abetting theory in the guidelines, the Court can discern no policy reasons why any sentence imposed . . . should not be imposed consecutively.
>
> . . . .

> The Court: I believe that I have the discretion to do it concurrently or consecutively, but I'm going to exercise my discretion so as to impose it, to calculate the advisory guidelines range by imposing it consecutively.

> . . . .

> The Court: What I meant is no reason I'd decide not to do it that way in the exercise of my discretion.

The district court provided sufficient justification for its decision. A district court "is not required to state a specific reason for a consecutive sentence," but must "make generally clear the rationale under which it has imposed the consecutive sentence." *Cochrane*, 702 F.3d at 346 (internal quotation marks and citation omitted). In this case the district court chose to begin, merely as a starting point in its reasoning, with a presumption that a consecutive sentence should be imposed because the underlying crime of brandishing a firearm in relation to a violent crime, on which the accessory-after-the-fact charge in Count Three is based, requires a consecutive sentence. The district court saw this as a "policy judgment," by Congress, but was willing to hear other "policy reasons" in favor of a concurrent sentence. Finding none of Defendants' arguments persuasive, the district court chose to impose a consecutive sentences. The court exercised its discretion and did not treat a consecutive sentence as mandatory. No miscarriage of justice having been established, this appellate challenge, too, is barred.

## III.

For these reasons, finding no miscarriage of justice warranting non-enforcement of Defendants' appellate waivers, we must grant the government's motion to dismiss the appeals. All four appeals are dismissed.